The United States is the largest and most populous country in the United States. purpose of the program is supposed to be for the libraries to be able to get easier to acquire titles The purpose of the program is supposed to be for the libraries to be able to get easier to acquire titles points that the libraries are most likely to acquire. In other words, the government is saying that this group of books is valuable and maybe valuable. Once we catalog them, the libraries can then pick through them and decide which ones they like and which ones they don't. But this other stack of books, they're not even valuable enough for the library to bother to look over them. So what happens is that even that portion of the market which is not required to use the CIP, that belief system that there are real books that the government thinks are worthwhile to catalog for free without any kind of requirements, without reviewing the text. This group of books are real books and these other things... The basis on which this original rule looks to me as if there may indeed have been a not illogical reason for deciding not to include privately printed books. Everybody wants to write their own life story and print it somewhere. And that experience may have shown that these are books in which libraries in general are not interested. Do we know, do you know, did it evolve in this litigation? How many such books there are that are kept off the list? I don't know the numbers of books. Or the ratio? I'm sorry, I do know that if you look through the numbers. First of all, part of the problem is that the publishing world, big publishers keep away numbers. We don't even know how many books are published in each given publication. But it's clear that there are very few big publishers. There are very few books published by the big publishers. We submitted studies and more anecdotal materials which show that the big publishers don't review most of what comes to them. They don't care what the writer has to say. What they care about is, is this guy famous? They care about their sales really and not the message. And they're limiting the message. We also know that before the CIP. But you've agreed that this is not a question of content. Well, what I'm saying, I think it's not a question of, they're not looking at the content and that might be part of the problem. Because for example, the court based itself on NEA v. Finley. And NEA is a benefit program which gives artists money to get their work out. And what they do is they have very thorough review of the material. And what my client left to Trent, he's saying, I wish they looked at my book. The problem is that there's a genre, there's a whole structure. What you're saying, Mr. Finkelstein, is that the failure of a government agency to provide a benefit is a taking. What I'm saying is that this, by creating this benefit, they have substantially transformed the structure of book selling, book publication. And what they have done, yes, they have, usually in a copyright taking case. When we think of a copyright taking, we call people copyright thieves. I have a quote from Backway, it went, and Durer called them pirates. When a copyright is taken, it means that book is being sold by people and profit is being made and the artist is deprived of the profit. What happens here is the government has created a system, a dual system where there are books and not books. And those books are deprived of art. I must have read a lot of not books. I read a lot of books. And I can't say I ever knew that a book that I read was part of this CIP program. But you don't need to know that, because who needs to know that is Barnes & Noble. Who needs to know that is the library. Who needs to know this is the New York Times Book Review, because the New York Times Book Review does not put those books on the cards. They don't even think about reviewing them, because they say they have no distribution. Publishers Weekly and the New York Times both said, we can't review this because they don't have distribution. And the reason they don't have distribution is because it's CIP. Now I should say, I never did get to answer Judge Newman about the history of it. And the history of it is that Mark Twain opened a publishing company which published, the only book that it published that was not by Mark Twain but was by Ulysses Brandt. He was a self-publisher. Walt Whitman, when Leaves of Grass, when he was trying to get it out, the publishers didn't want it. They weren't interested in it. He published it himself because he thought it was worthwhile. But this system didn't exist, right? That's what I'm saying. What I'm saying is Mark Twain was able to do this. Because once the book, if they had the money, you know there's that quote that freedom of the press belongs to those who can afford, who have the press. Mark Twain had the money, he was able to publish. Walt Whitman got the money from his friends or had the money, was able to publish. Left to Trim had the money. He created a publishing company. He was willing to comply with everything that the CIP required including book size, book paper. The government mentioned in the previous court about what if somebody prints nonsensical tissue paper books. He was able to comply with everything like that. The one thing he was not able to comply with was that he was not a pre-existing corporation. And so we think this… Wait, the requirement was that he had published other books, right? That he had published other books by, well, that there are three other authors being published. They can be published at the same time but they need to be there on slate to be published. Can I go back to the property interest for any here? Yes. Do you disagree that in order to have a property interest you need a legitimate entitlement? Yes. A legitimate claim of entitlement. Yes. Where is your claim of entitlement here? I believe that in this country, and I believe the copyright law shows this, that the author has property right to his book. And the property right in a book is largely the right to be able to sell that book. As I said, usually a copyright infringement is a theft of that right. In this case, the infringement is preventing him to get out into the market. There's a second right. There's a second property right, which is not as fundamental. I think this is fundamental. I think this is… I don't see how the American system can function without this. I mean, it combines First Amendment right, due process. We can think of all the cases where Jehovah's Witnesses were not allowed to protest because they were Jehovah's Witnesses. There were cases, and I cite them, where the only protest allowed was a labor protest. And, of course, because that was a labor protest and they didn't allow other people. But isn't the real question, when you cut through all of this, whether the regulation is reasonable? Well, yes, and I believe the regulation… To have a cutoff against privately printed or one-book markets? Well, I think it's more than whether it's reasonable. The minimal is that a regulation needs to be reasonable, and I think, and I briefed it, I think the regulation is thoroughly unreasonable because what it does is it says books that are published by their author are not worthy of review by a library. Okay, whereas books that are published by corporations are useful, interesting, things that libraries can look at, which is unreasonable because it's only the authors who write books. You're basically saying that, again, going back in history, because I can't point to anything now, if we had this CIP, when Mark Twain was printing, we would say, well, if he's printing his own books, they're not worth looking at. But there are so many books these days. Doesn't the Library of Congress have limited resources, and if they want to set up this program, isn't it reasonable for them to rely, to include only those that they think are going to be widely read? And, of course, because he's a self-publisher, Mr. Citrin probably wouldn't qualify, but something unreasonable in that program. Well, they do have limited resources, but there are different ways to dole out limited resources. When I want a driver's license, I pay for it. So the copyright office charges $45 for copyright. There are things that are thoroughly neutral. They could have set up a program where, within a given month, they could have X number of submissions, if there are too many books for them. These are things that would not impact on who the person is. At a bottom line, I think we should ask ourselves, if this was in place when Mark Twain was writing it, he would have been left out.  Is that a book that we would want to deprive our public of having access to? Mr. Citrin, again, the editor of the New York Times, a representative of Publishers Weekly, they said, we can't review these books because they have no distribution. And, of course, because they don't review these books, that's a circular kind of thing that makes it even harder for them. Do you want to save your rebuttal time? Yes, I think. Just to finish, again, I believe this is unreasonable because there's no added value that is given by these big publishers. They don't read the majority of the books that are submitted to them. They don't care about the writer's material. What they care about is, is he famous? And how does it impact their bottom line? There are other ways to deal with financial issues that don't impact on all these fundamental rights. And we believe that the property right is the right of the author in his book. And the second property right is, because the eligibility rule is unreasonable, and the author complies with all the rest of that, and the eligibility rule should not exist and should be struck down, that eligibility rule impacts on his property right in the CIP as a whole. Thank you, Mr. Finkerstein. Mr. Dufault, does anyone know how many books are in this category or what ratio of books? Yes, Chair. May it please the Court, good morning. If you turn to page 22 of the appendix, the government's appendix, they have the stated rationale for the CIP program and why it's limited to the degree that it is. The reason why they've limited it to publishers that have published at least three books is because the Library of Congress meets twice a year with librarians throughout the country. And they ask them, what do you want? What kind of information do you want from us? And how can we provide it to you in uniform fashion? I understand that, but I still, but I don't think it says how many books, therefore never get into this system because there's only one author or they're privately published. That's correct. I believe there are about 200,000 books per year that get into the system. That do get into the system. That's correct. I do not know how many do not. And as it states on page 22 of the appendix. I mean, if there are only 10 or 20, I don't know how many books Vanity Press or whatever publishes or people publish for themselves, then it seems, it's hard to find an objective justification. It doesn't hurt anything. If the Times doesn't want to review them, they can see or they would know or perhaps it can be flagged. This is one person's only work. Well, you can't look at it just from that perspective. I have two points to make. First, there are limited resources in the Library of Congress. It can only provide bibliographic information for so many. That's why I asked how many. And I believe you asked how many aren't getting into the system. And I do not know how many aren't getting into the system. But if it's only a handful, then it's very hard to justify their exclusion, isn't it? If there are as many privately printed or one-book books as there are others and they don't have a market, or in this case we understand that a goodly number of publishers declined to publish this book, that perhaps would tell a library that it may not have a wide readership. But if there are a few hundred thousand, that's one thing. If there are a couple of dozen, that's something else. Well, the effect in looking at Fifth Amendment takings analysis, the effect of this is really an opposite in this case. You could have ten or twelve that don't make it. You could have a hundred thousand that don't make it. Because the Supreme Court has long held, starting from South Dakota versus Dole, that the government has the right to define the outer contours and limits of benefits that it provides to the citizenry. I was going to ask, is the reasonableness of the restriction, regulation, whatever here, the issue? No, not in this case. What they're arguing is a straight-up takings case, a total taking. They stated below, before the Court of Federal Claims, that they were not presenting a regulatory takings case. Under the Penn Central analysis, the reasonableness of the government action might come into play. But the Court of Claims here did a Penn Central analysis, right? It did, just to exhaust every argument that the plaintiffs could have possibly made below, even though they didn't actually present a regulatory takings type case. And the plaintiffs, the appellants here specifically stated below that they weren't making that kind of case, that they believed this was a total taking. So when you look at a total taking, you have to have a distinct property interest, and you have to have a taking of that interest. But let's look here. That's true. The Court of Federal Claims did write an exhaustive opinion, thinking about all of the potential grounds, discrimination and others, that perhaps weren't pressed by this plaintiff. But it still seems to me that there's something very strange about drawing a line that, I don't know what the objective justification is, that there's unlikely to be a market for an individual's life history who's not a professional author. And therefore, it's not going to go on the list for commercial booksellers. Right, the objective is twofold. One, there's limited resources they can provide. That can't be justified, can it? If that's the reason, that's pretty hard to justify, for the government to reach that conclusion. Well, that's what the Library of Congress has reached its own conclusion. Again, on page 22 it says, resources available to support the CIP program are limited. And recognizing this limitation, they can only provide so many bibliographic references to libraries. And the flip side is, the libraries... this source of publications would have. No, they just state that there is an impact, but they don't go into... They didn't say there's an impact, they just said the resources are limited. That's right, well that's... They're probably doing what the librarians around the world, or they say, not probably, I gather, they say this is what the librarians and others tell us is useful. We're not interested in a sole author who publishes himself, because no publisher wants it. Well, that's precisely why they've done it that way. They've gone to the libraries because they serve the nation's libraries. And they ask the libraries, what do you want? What help can you get from the Library of Congress? How can we have a uniform system of bibliographic records? And they've asked the libraries, what do you want? And the libraries, if they were to lower the threshold, they might get deluged with millions of bibliographic references of books that they couldn't go through, and they couldn't pick out the ones that they think would be most likely to be read. But wouldn't it be helpful to know? Wouldn't it be helpful to know? I mean, it seems very strange. If there are millions, that's one thing. If everyone out there says, I have one book in my soul, and Vanity Press will publish it for me, or whatever. And for the librarians to say, just clutter up our shelves, no one wants to read that. But no one's told us that. Well, that's what's stated in the record, as that being the reason why they have the system. Let me just say that we have limited resources, but they don't say what kind of strain on their resources, a change of policy. Well, what they do is, they state that they engaged in conversations with these libraries, and they've asked, this is in the record, and they've asked the libraries, what do you want? And the libraries have said, we want books that we'll put in our shelves that people will be most likely to read. Why should our government yield to what librarians want, as opposed to making books, treating all authors the same? Well, all authors are able to get their books in the nation's libraries. If you're a self-published author, you can get your book in a library. You go to a library, and you try to get marketed on your own. There's nothing in the CIP to prevent these authors. How many libraries are there in the nation? How many libraries are there in the nation? You go to each one, buy them lunch, and say, here, put my book on your shelf? No, they probably wouldn't do that. But what they would do is engage in marketing efforts to get their book out there, to try to call up newspapers, to get them to review the book. And they would do what anybody would do when they want to market themselves or a book or a product that they have. And all they need is for the Library of Congress to include it on this list, and they don't have to do any of that. Well, there's another system that's available for them that's not the CIP program. And it's another control number system that they can engage in. They're mutually exclusive systems. And there is actually a number that they can use, so they'll have a copyright number that goes along with their book. But there isn't a bibliographic record of it. But the system doesn't depend on copyright, does it? There's nothing that says this book is excluded from the copyright. No, but it's assigned a number that's similar to a copyright number, and it's similar to this cataloging publication program number. I don't understand. There's two mutually exclusive programs that you can get. Well, you say assigned a number similar to a copyright number? Copyright number is the copyright number. It has nothing to do with this system. It's similar to the cataloging publication number, the pre-assigned control number program. That's what the program is called for one-author authors or one-book authors or self-published authors. And that's actually a uniform system that is sent to all libraries but through different channels. And there's no bibliographic record. I noticed that. But you didn't press in your brief that this is not discriminatory against newborn authors because they can go on another list for people who haven't previously published or whatever. It's not discriminatory for several reasons. First of all, it's a content-neutral requirement to be in this CIP program. You have to be published by a publishing company that's published at least three other authors. It's not going to the content, whether it's about religion or political views or anything like that. The only discrimination is related to the capacity of the program. Exactly. And because, again, we're dealing with a benefit and the government does have the right to define the outer limits of the benefit that it provides, provided it's not otherwise unconstitutional. That's precisely what's happening here. The discrimination is how many books you've written before this one. Well, that's not discrimination. That's just a definition of what they are. And again, this is a program where they're trying to aid libraries and they're not trying to limit people's First Amendment rights to expression or anything of that nature. During the Court of Claims discussion of the regulatory taking issue, it says the restrictions prevent the resources of the library CIP division from being overwhelmed. That's a finding of fact? That's a finding of fact that was made below, which is consistent with the CIP's own testament in the record that they have limited resources. Was there evidence? He doesn't say in that. Was there evidence in the Court of Federal Claims as to how much would overwhelm them? Not the precise threshold at which there would be a tipping point now. And there was no evidence provided by plaintiffs below that stated that they didn't have limited resources. Well, I guess read in context, as you point out, they didn't make the argument. The Court of Claims says in the context, because there's a footnote in the Court of Claims that said that counsel for the plaintiffs declined to offer an analysis of the facts in this case in terms of the Penn Central factor. Exactly, exactly. And so the evidence of record and the findings of fact that were made below by the trial court are based on web pages from the CIP program which evidence the spirit of the program and the rationale for it and the limited nature of it, and the fact that there's two different programs you can be in, either CIP or CMP, based upon how many books the particular publisher has published. And in this case, there's nothing that prevents plaintiffs from going out and marketing their books. Now, yes, they may have a tougher time because their stuff isn't benefiting from the program, the CIP program, but nothing prohibits them from getting their message out if they wrote a quality book and getting it reviewed and getting people to buy it. Now, going back to a Fifth Amendment statement, again, you have to have a distinct property interest, and you have to have a take in that interest. And here there's tenets of the CIP program, and plaintiffs and appellants are not eligible to be in that program. The tenets and requirements of the program are stated, and it wasn't like they were eligible for it and they weren't allowed into it. They specifically were not eligible for it, and they knew they weren't into it. You're saying there's no property interest in the system even though there's a property interest in the book. Right. Those are two different things. What they're challenging, though, is not the book, not their ability to get the book out, but their ability to be in the CIP system. He's saying that because of his interest, as he defines it, in the program being violated, in effect, he's losing his interest in the book. Right. That's basically his argument. Well, that's his argument. He's saying there's a program I'm not eligible for, and because I can't get into it... Therefore, the value of my book is being destroyed. The value of my book is diminished. But what our argument is he never had entitlement. He didn't have any specific property right into that program because he wasn't eligible for it. And with regard to the value of his book, the program has no bearing on that whatsoever. The book is what it is. If it's a valuable book, it's a valuable book. If it's a book that's destined to be read by a lot of people, it will be, much like the Mark Twain books that he's cited before. The issue in this case is more nuanced. It's just, is he eligible to be in the program? No. And because he's not in the program, does that amount to a Fifth Amendment taking somehow? Was the kite runner put in this program originally? I don't know. A new novelist that later... Well, I have heard anecdotally from the attorneys from the Library of Congress there are numerous books that have sold millions of copies that weren't eligible to be in the CIP program. And a lot of them were published by authors. And because they were able to get there and hustle and get their word out, they became wildly famous and popular. Here, in Plaintiff's complaint, they outlined the parameters of the CIP program. They acknowledged it was not eligible. They concede that the program has been run as it's advertised to be run. Thus, they concede that no error was made by the Library of Congress group below. It's challenging the program, not how it's run. Again, they're trying to get a Fifth Amendment... They're trying to make a Fifth Amendment takings claim based on something they're not eligible for. And because they don't have any property interest, that interest wasn't taken away. And for that reason, and because they concede the points that they're not eligible for the program, they failed to state a claim. Maybe they've got the wrong part of the Constitution. What's that, Your Honor? Maybe they've got the wrong part of the Constitution. Well, possibly, but that raises jurisdictional issues. I mean, if what they're making is a First Amendment takings... I mean, if they're making a First Amendment constitutional argument, that argument in and of itself, naked, would not be something that the Court of Federal Claims below would have had jurisdiction to consider. It can only consider to the degree that it's actually tethered to their Fifth Amendment takings claim. So if what they really are interested in is their First Amendment constitutional claim, then the CFC and this Court aren't the jurisdictions that they should be in. Yeah. Thank you. Okay. Any more questions? Any more questions? Thank you, Mr. McCaul. Thank you. Mr. Finkelstein, you have one minute. Your Honor, I believe the government's attorney mischaracterized the issue. Part of the challenge here is we believe that the Court erred in granting motion to dismiss, and we believe it mischaracterized a lot of the record, and we laid out point by point in our brief. One of the things we didn't specifically put in our brief, but the claim by the Court that we didn't make a Penn Central analysis, well, in front of the Court, in the middle of the questioning, what I said was that there's more to it. We believe it's a stronger taking. In the papers, however, we do cite, for example, Asilo v. Rhode Island, we cite a number of statements that show that a distinct property interest can exist, even though a regulation came into being before one bought the property, and we make those analysis in the papers. That was inaccurate. For the rest of it, the PCN, which he mentions as an alternative program, is not an alternative. It's a thoroughly opposite program, which actually prevents the author's ability to enter. And just to conclude, again, there is a fundamental property. Very quick analogy, if you have a house, you build the house, you put everything into it, and you want to hook up electricity, and the government says, well, you know what? We provide the benefit of electrical hookup only to large-scale developers. If you want your house to be hooked up to electricity, sell it to a large-scale developer, rent it back from him, and we'll let you put in electricity. It's in my brief. I'm sorry, it's not in my brief. It's an analogy, just an analogy. This is what happened here. Yes, the book is there. The book can be put on the shelf, the book can be put out into the internet, but it cannot enter the mainstream of where books are. It cannot be given to a big vendor to go out and sell to all the big stores. Okay. We have the picture. Thank you. Thank you, Mr. Finkelstein and Mr. Dufault.